UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | DOCKET NO. 3:25-cr-168-KDB |
| v. ) | |
| ) | **FACTUAL BASIS** |
| BRIAN SHANE HAIGLER ) | |
| ) | |

NOW COMES the United States of America, by and through Russ Ferguson, United States Attorney for the Western District of North Carolina, and hereby files this Factual Basis in support of the plea agreement filed simultaneously in this matter.

This Factual Basis is filed pursuant to Local Criminal Rule 11.2 and does not attempt to set forth all of the facts known to the United States at this time. By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the plea agreement, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s). The parties agree not to object to or otherwise contradict the facts set forth in this Factual Basis.

Upon acceptance of the plea, the United States will submit to the Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4. The defendant may submit (but is not required to submit) a response to the Government's "Statement of Relevant Conduct" within seven days of its submission. The parties understand and agree that this Factual Basis does not necessarily represent all conduct relevant to sentencing. The parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis. Either party may present to the Court additional relevant facts that do not contradict facts set forth in this Factual Basis.

1. Beginning on or about February 2019 through December 2021, in the Western District of North Carolina and elsewhere, Brian Shane Haigler ("HAIGLER") engaged in a scheme to defraud various individuals, his church, and the federal government through materially false, fraudulent and/or misleading statements, representations, deceptive half-truths, and/or omissions.

2. HAIGLER's scheme to defraud unfolded in three ways:

    a. HAIGLER defrauded victim-investors, including friends and social acquaintances, promising that the money would be invested in real estate purchase or improvement. Instead of using the money as promised, HAIGLER used a portion of the victim-investor funds for personal expenditures or interest payments to other investors.

    b. HAIGLER embezzled money from his church, Victim-Church 1, to repay his victim-investors and for personal expenditures.

c.  In early 2021, Haigler fraudulently obtained a loan through the EIDL program – in the name of Victim-Church 1 and without its knowledge or consent – and used the proceeds for his own personal benefit.

3.  In carrying out the scheme described herein, HAIGLER acted with an intent to defraud.

### Participants and Related Entities

4.  HAIGLER was a resident of Mint Hill, North Carolina, within the Western District of North Carolina.

5.  Victim-Church 1 was a religious entity in the Western District of North Carolina for which HAIGLER served as Treasurer. In that role, he had authority over Victim-Church 1's bank accounts. Following the death of the pastor of Victim-Church 1 in early 2019, HAIGLER was the sole signatory on Victim-Church 1's bank accounts.

### The CARES Act and EIDL Program

6.  On March 13, 2020, President Donald J. Trump declared an emergency under Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act in response to coronavirus disease 2019 ("COVID-19"). On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which was designed to provide emergency financial assistance to the millions of Americans suffering the economic effects caused by the COVID-19 pandemic. The CARES Act established several new temporary programs and provided for the expansion of others, including programs created and/or administered by the SBA, to administer the emergency relief.

7.  One of the programs expanded by the CARES Act was the EIDL program, which was an SBA program that provides low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

a.  EIDL proceeds could only be used for working capital to alleviate economic injury caused by the disaster (related to the COVID-19 pandemic) occurring in the month of January 2020 and continuing thereafter.

b.  EIDL funds were issued directly from the United States Treasury, and an applicant applied through the SBA via an online portal. In the electronic application, the applicant certified that all of the information in the application was true and correct to the best of the applicant's knowledge and was warned that any false statement or misrepresentation to the SBA or any misapplication of loan proceeds may result in sanctions, including criminal penalties. The application also stated that the SBA relies upon the self-certifications in the EIDL application in determining whether the applicant was eligible for an EIDL.

c.  The EIDL application process collected information concerning the business and the business owner, including information regarding the business' gross

2

revenue for the 12-month period preceding the disaster, which for COVID-19 was defined as January 31, 2020; the cost of goods sold for the 12-month period preceding the disaster; the number of employees employed by the business at the time of the disaster; information as to the criminal history of the business owners; and information regarding anyone that assisted in the preparation of the application.

## The Investment Fraud

8. HAIGLER's scheme to defraud began, in or about February 2019, with him recruiting friends or acquaintances to lend money to fund real estate transactions.

9. HAIGLER made material misrepresentations to victim investors including misrepresentations that the money loaned would be used for the purchase or improvement real property when in truth and in fact, a portion of the money was used to repay prior investor-victims and for HAIGLER's personal expenditures.

10. In furtherance of his scheme, HAIGLER often provided victim-investors false and/or fraudulent documents that purported to set out the terms of the financial agreements, including, for example, loan agreements that provided that:

   a. An investor would invest a certain dollar amount with HAIGLER.

   b. HAIGLER would use the funds for the purchase of real property at a particular location.

   c. The investment would be conditioned upon terms, including that HAIGLER would return proceeds of a specified amount to the investor, for example a "flat 10% return," by a date certain.

11. HAIGLER would sign the loan agreements, usually transmitting them back to the victim-investors electronically.

12. HAIGLER would then direct the victim-investors to write a check or to wire their investment and loan funds to either HAIGLER's personal account or a business account which HAIGLER controlled.

13. As part of the fraudulent scheme, and contrary to the representations made to victim-investors, very little, if any, of the victim-investor money was actually used as specified in "loan agreements." Rather, a significant portion of victim-investor funds was used by HAIGLER for personal expenditures or to make debt payments to prior investor-victims.

14. When victim-investors tried to obtain the promised returns and/or the return of their initial investment from HAIGLER, HAIGLER would make additional materially false, fraudulent and/or misleading statements, representations, deceptive half-truths, and/or omissions in an attempt to explain his inability to make the payments and lull the victim-investors.

3

### Embezzlement from Victim-Church 1

15. In approximately July 2019, HAIGLER expanded his scheme by embezzling from Victim-Church 1's bank account, so that he could make payments to prior investor-victims and make personal expenditures.

16. As part of the scheme, HAIGLER withdrew cash from Victim-Church 1's account and wrote checks on the account that were made out to either himself or to "cash." He would then deposit the embezzled money into his personal bank account.

17. In one example:

    a. On or about August 1, 2019, HAIGLER wrote a check from Victim-Church 1's bank account in the amount of $160,000 made payable to "Brian Haigler."

    b. HAIGLER then deposited the $160,000 into his personal bank account.

    c. The next day, on or about August 2, 2019, HAIGLER used the majority of the $160,000 he took from Victim-Church 1 to make a payment of $150,000 to Investor-Victim C.W.

18. In total, from in or about July 2019 through in or about December 2021, HAIGLER wrote 53 checks and made three cash withdrawals from Victim-Church 1's bank account, depositing approximately $389,000 of Victim-Church 1's funds into his personal bank account.

### Fraudulently Obtained EIDL in the Name of Victim-Church 1

19. In or around April 2021, HAIGLER further expanded his fraud scheme, using the SBA's electronic portal to submit an EIDL application for a $311,000 EIDL in the name of Victim-Church 1, without Victim-Church 1's knowledge or consent.

20. Among other things, HAIGLER fraudulently represented the proceeds of the EIDL would be used "solely as working capital to alleviate economic injury caused by the disaster in the month of January 31, 2020."

21. On or about April 20, 2021, the $311,000 in EIDL proceeds was deposited into Victim-Church 1's bank account.

22. On or about April 21, 2021, HAIGLER transferred $300,000 from Victim-Church 1's bank account to his own bank account. HAIGLER then used the EIDL proceeds to purchase property unrelated to church endeavors.

### Discovery of HAIGLER'S Fraud Scheme

23. In or about March 2022, HAIGLER admitted to the then pastor of Victim-Church 1 that he had sought and obtained the EIDL in the name of Victim-Church 1.

4

24. The amount of loss that was known to or reasonably foreseeable to HAIGLER as a result of his criminal conduct described herein was more than $550,000 but less than $1.5 million.

RUSS FERGUSON
UNITED STATES ATTORNEY

_____
Maria K. Vento
ASSISTANT UNITED STATES ATTORNEY

_____
Eric Frick
SPECIAL ASSISTANT UNITED STATES ATTORNEY

### Defendant's Counsel's Signature and Acknowledgment

I have read this Factual Basis, the Bill of Information, and the plea agreement in this case, and have discussed them with the defendant. Based on those discussions, I am satisfied that the defendant understands the Factual Basis, the Bill of Information, and the plea agreement. I hereby certify that the defendant does not dispute this Factual Basis.

_____          DATED: 6-27-25
C. Melissa Owen, Attorney for Defendant

5